1

2

3

4

5

6

7

8                             UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JOSE M. PEREZ,                               No.  2:18-cv-0629 MCE DB P

12                 Petitioner,

13         v.                                     FINDINGS AND RECOMMENDATIONS

14   MARION SPEARMAN,

15                 Respondent.

16

17          Petitioner is a state prisoner proceeding pro se and in forma pauperis with a petition for a

18   writ of habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges his conviction imposed by

19   the Sacramento County Superior Court in 2015 for robbery with firearm and gang enhancements.

20   Petitioner alleges his right to confront witnesses was violated by the admission of a text message,

21   an instruction to the jury was improperly argumentative, and there was insufficient evidence to

22   support the gang enhancement.  For the reasons set forth below, this court will recommend the

23   petition be denied.

24                                     **BACKGROUND**

25   **I.  Facts Established at Trial**

26          Petitioner was tried with co-defendant Jasmine Maria Velasquez.  The California Court of

27   Appeal for the Third Appellate District provided the following factual summary:

28   ////

                                              1

This case involves seven robberies and three carjackings occurring between April 16 and May 22, 2013, all committed at gunpoint by validated Sureño gang members. Velasquez, a Santa Anita Park Sureña,[n.2] planned the crimes along with seven other people, including Pedro Madrigal, a member of the Angelino Heights Sureños, and members of the Howe Park Sureños. The armed robberies were to "benefit . . . the gang" and "get money so we could get drugs and guns." Although, by the end of the crime spree, Madrigal suspected the money was going to Velasquez's incarcerated boyfriend, David Zamora, a member of the Howe Park Sureños. Although Velasquez was charged with all of these crimes, defendant was charged only with the robbery of the Jack in the Box and we limit our recitation of the facts accordingly.

Defendant, who was close friends with Madrigal, was also a member of the Angelino Heights Sureños. Defendant's moniker was Chango ("Monkey" in Spanish) or Bullet. On May 19, 2013, Velasquez sent a text message to Madrigal telling him to help the next day in robbing a Jack in the Box, reading, "Hey be ready tomorrow morning wit Chango." Madrigal had already participated with Velasquez in one armed carjacking and three armed convenience store robberies, all at issue in this case. Madrigal discussed the planned Jack in the Box robbery with defendant, who agreed to participate.

The next day, Isabel Munoz Vazquez, a Jack in the Box employee, left the restaurant to make a bank deposit of $4,100 in cash. As Vazquez got into her car, defendant and Madrigal approached, their faces covered with red cloths.[n.3] They both pointed guns at Vazquez and one of the men demanded money. The men stole the cash Vazquez was going to deposit and her purse, which contained her wallet and cell phone. The men fled in a gold Cadillac driven by Velasquez. Police later seized Velasquez's gold Cadillac and found inside a red bandana containing defendant's DNA. Madrigal kept $900 of the robbery proceeds for himself and gave $200 to defendant and $3,000 to Velasquez.

## A. Gang Evidence

Detective Lizardo Guzman, a member of the Sacramento County Sheriff's Department's gang suppression unit, testified at trial as an expert in Hispanic gangs, both Norteño and Sureño. Guzman testified there are two primary Hispanic gangs in Sacramento, the Norteños and Sureños, and they are rivals. Both the Norteños and Sureños are linked to the prison gangs known as Nuestra Familia and the Mexican Mafia, respectively. The Mexican Mafia is also known as "La Eme" (the pronunciation of the letter M in Spanish). Throughout his career, Guzman has had contact with at least 100 Sureños.

The Sureño gang is an umbrella group with subsets or "teams" throughout Sacramento. The Sureño gang is originally from Southern California, so they are not as numerous in Sacramento as the Norteños. Because they are fewer in number in Sacramento, Detective Guzman explained it is "not uncommon to see Sureños from several different neighborhoods or cliques all together getting along . . . ." Territories are "not as important to Sureños as far as

rivals with other Sureños," and a member in good standing is, "welcome at any of their gang hangouts." For example, it would not be uncommon to see a Howe Park Sureño member in the area of a South Sacramento Sureño subgroup known as Caya 47th (or 47th Street), and vice versa. The Sureño subsets "all hold their own weight," "sit at the same table," and all attend a monthly meeting to "talk business," which is held at a different location every month.

One of the biggest North Sacramento Sureño subsets is the Howe Park Sureños, with more than 25 members and a territory that includes Howe Park in Sacramento. The Santa Anita Park Sureñas, which Detective Guzman became aware of as a result of this case, are a female subset of the Howe Park Sureños and have a territory adjacent to Howe Park. The Angelino Heights Sureños subset is originally from Los Angeles and is now becoming established in Sacramento, with at least six members. The Angelino Heights Sureños in Sacramento must travel monthly to Los Angeles for gang meetings and to pay "taxes." The group does not have a specific geographical territory and members "hang out" in Sureño neighborhoods or territories.

Sureños are proud of their gang membership. Like all gangs, members identify themselves with tattoos, brandings, colors, hand signs, who they associate with, the territories they claim, and where they hang out. Each member also has a moniker or nickname, in an effort to avoid knowing each others' real names and to make it more difficult for anyone cooperating with the police. Sureños are associated with the number 13, which stands for the letter M, and shows allegiance to the Mexican Mafia. Sureños are also associated with the color blue, since Mexican Mafia members were issued blue handkerchiefs in prison. In contrast, the Norteños are associated with the color red and the number 14, which corresponds to the letter N, and Nuestra Familia. Subsets may also have special markers, such as a tattoo with A and H for the Angelino Heights Sureños.

In the 1990's, the Mexican Mafia "sat down" with all the Sureño gang members and set down certain rules, including banning drive-by shootings for Southern California Sureño gang members. In addition, the Mexican Mafia started requiring Sureño subsets to pay taxes from the proceeds of their criminal activity. Typically a representative from the prison gang will go out to the Sureño subsets and collect the taxes. In exchange, the Mexican Mafia provides protection when a Sureño comes to prison. Any Sureño subsets that did not pay taxes would not be protected in prison.

The primary activities of the Sureños are murder, firearm possession, robbery, assault with a deadly weapon, possession of controlled substances for sale, burglary, carjacking, and home invasion robbery.

Detective Guzman also testified to two predicate offenses involving Sacramento Sureño subsets: (1) validated Sureño gang member Mario Rodriguez was convicted in 2013 of being a felon in possession of a firearm and being a felon in possession of ammunition (§§ 29800, 30305). Rodriguez admitted to police he had the gun for his protection against rival Norteño gang members; and

(2) validated Sureña gang member Daisy Ramirez discharged a handgun at a group of five Norteño gang members and was convicted in 2013 of assault with a firearm and discharging a firearm from a moving vehicle (§ 245, subd. (a)(2), former § 12034, subd. (c)).

In Detective Guzman's opinion, defendant was a member of the Sureño gang and the Angelino Heights subset. He had numerous Sureño gang tattoos, including three dots on his left wrist and one dot on his right wrist, symbolizing the number 13, the letter M, and his allegiance to the Mexican Mafia. In addition, defendant symbolized his allegiance to the Angelino Heights Sureños with an "Angelino Heights" tattoo on his chest and the letters A and H tattooed on his back. He also made a gang sign during a previous jail booking photo.

Defendant admitted to police he was a Sureño. In addition, Detective Guzman was aware of at least five occasions between 2010 and 2014 where the police found defendant in the company of validated Sureño gang members, including members of the Angelino Heights and Howe Park subsets.

In Detective Guzman's opinion, Velasquez was also a Sureño gang member. She had numerous Sureño gang tattoos, including the number 13 on her left hand and three dots on her face and right hand. She also had an "SPS" tattoo, symbolizing her allegiance to the Santa Anita Park Sureñas. In addition, Velasquez told police she was a Sureña and police had previously found Velasquez in the company of other validated Sureño gang members, including her brother, who is a validated Howe Park Sureño.

The prosecutor posed several hypothetical questions to Detective Guzman in line with the evidence presented in the case. Guzman opined the hypothetical crimes as described (robberies and carjackings) would benefit or promote the gang by bringing money into the gang and providing getaway vehicles not associated with the gang. The gang would even benefit if the criminal proceeds were funneled to an incarcerated member because that member would have money to pay for things in jail, such as extra clothing and food, and because it would bring the gang into the good graces of the dominant prison gang, such as the Mexican Mafia. In addition, a gang would benefit from a member possessing a weapon because this is "the ultimate item that demands respect" from both fellow and rival gang members. Finally, planning and executing these crimes would increase the status of the gang and its members and instill fear in the gang's community.

In addition to Detective Guzman, Madrigal also testified at trial about the Sureño gang. Similar to Guzman, Madrigal testified the Sureños originated from the Mexican Mafia and are associated with the number 13 and three dots. The Sureños also have a particular hand sign known as "The S," which members use to signal they are a Sureño.

Madrigal testified there are four or five Sureño subsets in Sacramento, including Angelino Heights, Howe Park, and Santa Anita Park, all three of which are located in or around Howe Park.

According to Madrigal, the Howe Park Sureños had about 100 members, while the Angelino Heights Sureños had about 30 members. Because the Howe Park Sureños have more members, they are "more prestigious" and stronger than the Angelino Heights Sureños. Although some people in the Angelino Heights and Howe Park Sureños dislike each other and do not work together, historically the two groups "all associate together" and have an "alliance." It was common for the Angelino Heights, Howe Park, and Santa Anita Park subsets to share guns.[n. 4]

> [fn 2]   As the prosecution's gang expert testified, "Sureña" signifies a female Sureño subgroup or member.

> [fn 3]   During the crime spree at issue here, to throw off police, the participants (Sureños) disguised themselves by wearing red bandanas—the color affiliated with their rival gang, the Norteños.

> [fn 4] For example, one time a Howe Park Sureño member asked Madrigal to hold on to a revolver and never came to retrieve it.

People v. Perez, No. C079383 (Cal. Ct. App. Feb. 17, 2017) (ECF No. 14-11 at 2-7[1]).

## I. Procedural Background

### A.  Relevant State Trial Court Proceedings

The California Court of Appeal summarized the relevant pretrial motion as follows:

> Prior to trial, defendant moved pursuant to *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476] (*Bruton*) and *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) to exclude statements made by Velasquez that implicated defendant, including Velasquez's text to Madrigal the night before the Jack in the Box robbery, reading, "be ready tomorrow morning wit Chango." The trial court held the text was admissible, reasoning it was nontestimonial and therefore did not trigger the confrontation clause or the *Aranda/Bruton* rule. In addition, the trial court noted the text was a private message between friends in a noncoercive setting, indicating trustworthiness. Finally, although the trial court did not believe the text was hearsay, if it were, the text was admissible under the coconspirator hearsay exception.

(ECF No. 14-11 at 7.)

////

////

---

[1] Respondent lodged an electronic copy of the state court record.  (See ECF No. 14.)  The appellate briefs and opinions are lodged at ECF Nos. 14-8 to 14-11.  The trial transcript is lodged at ECF Nos. 14-3 to 14-7.

1    A jury convicted petitioner of second-degree robbery and found true the gang and firearm

2    enhancements.  The trial court sentenced petitioner to prison for an aggregate 25 years, including

3    ten years for the gang enhancement.

4         **B.  State Appeal and Federal Proceedings**

5         On appeal, petitioner raised the same three claims he raises in his present petition.  (ECF

6    No. 14-8.)  On February 17, 2017, the California Court of Appeal affirmed the judgment and

7    sentence.  (ECF No. 14-11.)  On May 17, 2017, the California Supreme Court denied the petition

8    for review.  (ECF No. 14-12.)

9         Petitioner then filed a petition for a writ of habeas corpus in the Sacramento County

10   Superior Court.  He raised the same claims he had raised on appeal.  The superior court denied

11   the petition in May 2018.  (ECF No. 14-13.)  Petitioner filed no further post-conviction actions in

12   state court.

13        Petitioner filed the present federal habeas petition on March 23, 2018.  (ECF No. 1.)

14   Respondent filed an answer.  (ECF No. 15.)  Petitioner did not file a reply.

15        **STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

16        An application for a writ of habeas corpus by a person in custody under a judgment of a

17   state court can be granted only for violations of the Constitution or laws of the United States.  28

18   U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

19   application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

20   U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

21        Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

22   corpus relief:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or

////

6

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'"  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37 (2012)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct."  Id. at 1451.  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue.  Carey v. Musladin, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405-06).  "Under the 'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.'"  Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 411; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75 ("It is not

7

1    enough that a federal habeas court, in its independent review of the legal question, is left with a

2    firm conviction that the state court was erroneous." (Internal citations and quotation marks

3    omitted.)).  "A state court's determination that a claim lacks merit precludes federal habeas relief

4    so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

5    Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652,

6    664 (2004).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a

7    state prisoner must show that the state court's ruling on the claim being presented in federal court

8    was so lacking in justification that there was an error well understood and comprehended in

9    existing law beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103.

10          There are two ways a petitioner may satisfy subsection (d)(2).  Hibbler v. Benedetti, 693

11   F.3d 1140, 1146 (9th Cir. 2012).  He may show the state court's findings of fact "were not

12   supported by substantial evidence in the state court record" or he may "challenge the fact-finding

13   process itself on the ground it was deficient in some material way."  Id. (citing Taylor v. Maddox,

14   366 F.3d 992, 999-1001 (9th Cir. 2004)); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir.

15   2014) (If a state court makes factual findings without an opportunity for the petitioner to present

16   evidence, the fact-finding process may be deficient and the state court opinion may not be entitled

17   to deference.).  Under the "substantial evidence" test, the court asks whether "an appellate panel,

18   applying the normal standards of appellate review," could reasonably conclude that the finding is

19   supported by the record.  Hibbler, 693 F.3d at 1146 (9th Cir. 2012).

20          The second test, whether the state court's fact-finding process is insufficient, requires the

21   federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-

22   finding process] is pointed out would be unreasonable in holding that the state court's fact-finding

23   process was adequate."  Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d

24   943, 972 (9th Cir. 2004)).  The state court's failure to hold an evidentiary hearing does not

25   automatically render its fact finding process unreasonable.  Id. at 1147.  Further, a state court may

26   make factual findings without an evidentiary hearing if "the record conclusively establishes a fact

27   or where petitioner's factual allegations are entirely without credibility."  Perez v. Rosario, 459

28   F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

8

1    The court looks to the last reasoned state court decision as the basis for the state court

2    judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

3    "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from

4    a previous state court decision, [this court] may consider both decisions to 'fully ascertain the

5    reasoning of the last decision.'"  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

6    banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)).  "When a federal claim

7    has been presented to a state court and the state court has denied relief, it may be presumed that

8    the state court adjudicated the claim on the merits in the absence of any indication or state-law

9    procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption may be

10   overcome by showing "there is reason to think some other explanation for the state court's

11   decision is more likely."  Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

12   Similarly, when a state court decision on a petitioner's claims rejects some claims but does not

13   expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

14   the federal claim was adjudicated on the merits.  Johnson v. Williams, 568 U.S. 289, 293 (2013).

15   When it is clear, that a state court has not reached the merits of a petitioner's claim, the

16   deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court

17   must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099,

18   1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

19   If a petitioner overcomes one of the hurdles posed by section 2254(d), the federal court

20   reviews the merits of the claim de novo.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir.

21   2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear

22   both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is

23   such error, we must decide the habeas petition by considering de novo the constitutional issues

24   raised.").  For the claims upon which petitioner seeks to present evidence, petitioner must meet

25   the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual

26   basis of [the] claim in State court proceedings" and by meeting the federal case law standards for

27   the presentation of evidence in a federal habeas proceeding.  See Cullen v. Pinholster, 563 U.S.

28   170, 186 (2011).

1

**ANALYSIS**

2     Petitioner raises three claims for relief:  (1) his right to confront witnesses under the Sixth

3  Amendment was violated by the admission of a text message; (2) an instruction to the jury was

4  improperly argumentative in violation of his rights to due process; and (3) there was insufficient

5  evidence to support the gang enhancement in violation of his due process rights.[2]  Each is

6  addressed below.

7  **I. Admission of Text Message**

8     In his first claim, petitioner challenges the trial court's admission, over his attorney's

9  objection, of a text message co-defendant Velasquez sent to co-defendant Madrigal the day before

10  the Jack-in-the-Box robbery.  That message told Madrigal: "Hey be ready tomorrow morning wit

11  Chango."  Chango was petitioner's nickname.

12     Petitioner argues that the admission of the text message violated his right to confront the

13  witnesses against him guaranteed by the Sixth Amendment.  In the alternative, petitioner argues

14  that the text message was inadmissible hearsay.

15     **A. Legal Standards for Confrontation Clause Claim**

16     The Sixth Amendment to the United States Constitution grants a criminal defendant the

17  right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "The 'main and

18  essential purpose of confrontation is to secure for the opponent the opportunity of cross-

19  examination.'"  Fenenbock v. Dir. of Corrs. for Calif., 692 F.3d 910, 919 (9th Cir. 2012) (quoting

20  Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986)).

21     In 2004, the United States Supreme Court held that the Confrontation Clause bars the state

22  from introducing into evidence out-of-court statements which are "testimonial" in nature unless

23  the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness,

24  regardless of whether such statements are deemed reliable.  Crawford v. Washington, 541 U.S. 36

25  (2004).  The Crawford rule applies only to hearsay statements that are "testimonial" and does not

26

27  [2] The petition is very brief.  Because petitioner is proceeding in pro se and raised each of these
    issues on appeal, this court has reviewed the appellate briefs (ECF No. 14-8, 14-10) to determine
28  petitioner's arguments.

1  bar the admission of non-testimonial hearsay statements.  Id. at 42, 51, 68; see also Whorton v.

2  Bockting, 549 U.S. 406, 420 (2007) ("[T]he Confrontation Clause has no application to" an "out-

3  of-court nontestimonial statement."); Lucero v. Holland, 902 F.3d 979, 988 (9th Cir. 2018)

4  (Confrontation Clause covers only "testimonial codefendant statements").

5       In Crawford the United States Supreme Court did not define "testimonial," but outlined a

6  "core class of testimonial statements." Lucero, 902 F.3d at 988-89.  Testimonial statements

7  include those that are:

8             ex parte in-court testimony or its functional equivalent—that is,
             material such as affidavits, custodial examinations, prior testimony
9             that the defendant was unable to cross-examine, or similar pretrial
             statements that declarants would reasonably expect to be used
10            prosecutorially; extrajudicial statements contained in formalized
             testimonial materials, such as affidavits, depositions, prior
11            testimony, or confessions; statements that were made under
             circumstances which would lead an objective witness reasonably to
12            believe that the statement would be available for use at a later trial.

13  Crawford, 541 U.S. at 51-52 (internal citations omitted).

14       The Supreme Court further elucidated the borders of testimonial evidence through

15  application of the "primary purpose" test.  Lucero, 902 F.3d at 989 (citing Ohio v. Clark, 576

16  U.S. 237, 244 (2015)).  Specifically, "a statement cannot fall within the Confrontation Clause

17  unless its primary purpose was testimonial."  Clark, 576 U.S. at 245.  The central question under

18  that test "is whether, in light of all the circumstances, viewed objectively, the 'primary purpose'

19  of the conversation was to 'create an out-of-court substitute for trial testimony.'"  Id. (citation and

20  alteration omitted).

21       Confrontation Clause violations are subject to harmless error analysis.  Whelchel v.

22  Washington, 232 F.3d 1197, 1205–06 (9th Cir. 2000).  "In the context of habeas petitions, the

23  standard of review is whether a given error 'had substantial and injurious effect or influence in

24  determining the jury's verdict.'"  Christian v. Rhode, 41 F.3d 461, 468 (9th Cir. 1994) (quoting

25  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).  Factors to be considered when assessing the

26  harmlessness of a Confrontation Clause violation include the importance of the testimony,

27  whether the testimony was cumulative, the presence or absence of evidence corroborating or

28  ////

1    contradicting the testimony, the extent of cross-examination permitted, and the overall strength of

2    the prosecution's case.  Van Arsdall, 475 U.S. at 684.

3         **B.  Decision of the State Court**

4         Because the California Supreme Court denied review, the decision of the California Court

5    of Appeal is the last reasoned decision of the state court on each of petitioner's claims.

> Defendant contends the trial court violated his Sixth Amendment confrontation clause rights by failing to exclude Velasquez's text message telling Madrigal to "be ready tomorrow morning wit Chango." According to defendant, the text was an extrajudicial confession of his nontestifying codefendant Velasquez and is accordingly inadmissible under the *Aranda/Bruton* rule. In the alternative, defendant contends Velasquez's text was not a coconspirator statement and was therefore inadmissible hearsay. We disagree.
>
> Under the *Aranda/Bruton* rule, a " ' " 'nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given.' " ' " (*People v. Capistrano* (2014) 59 Cal.4th 830, 869.) In *Crawford v. Washington* (2004) 541 U.S. 36, 53-54 [158 L.Ed.2d 193, 195], the Supreme Court held the confrontation clause only bars admission of "testimonial statements" of unavailable witnesses where the defendant had no prior opportunity for cross-examination. Accordingly, an out-of-court nontestimonial statement, including a statement by a codefendant, does not implicate the confrontation clause. (*See, e.g.*, *People v. Arceo* (2011) 195 Cal.App.4th 556, 571, 573; *United States v. Smalls* (10th Cir. 2010) 605 F.3d 765, 768, fn. 2.)
>
> It is undisputed Velasquez's text was nontestimonial, and we decline defendant's invitation to reject established case law and apply the *Aranda/Bruton* rule. Accordingly, " 'the issue is simply whether the statement is admissible under state law,' " either because it is not hearsay or falls under an exception to the hearsay rule. (*People v. Arceo*, *supra*, 195 Cal.App.4th at p. 573; *see Ohio v. Clark* (2015) 576 U.S. ___. ___ [192 L.Ed.2d 306, 317] ["statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers"].)
>
> Although Velasquez's text does not appear to have been offered for the truth of the matter asserted, even if it were hearsay, we would conclude it was properly admitted under the coconspirator exception. (Evid. Code, § 1223; *see People v. Montes* (2014) 58 Cal.4th 809, 863 ["an out-of-court statement can be admitted for the nonhearsay purpose of showing that it imparted certain information to the hearer, and that the hearer, believing such information to be true, acted in conformity with such belief"].) Under Evidence Code section 1223, a hearsay statement made by a defendant's coconspirator is

admissible against the defendant if there is independent prima facie evidence of the existence of a conspiracy and independent evidence of the following three preliminary facts: "(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy." (*People v. Leach* (1975) 15 Cal.3d 419, 430-431, fn. 10.) The prosecution must present "independent evidence to establish prima facie the existence of [a] conspiracy." (*Id.* at p. 430.) As the courts have explained, " '[e]vidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' " (*People v. Clark* (2016) 63 Cal.4th 522, 562.)

Despite defendant's contentions, the prosecution presented sufficient independent evidence from which the trial court could have found a conspiracy between Madrigal, Velasquez, and defendant to rob the Jack in the Box. Copies of Velasquez's other texts and testimony from Madrigal and other witnesses demonstrated Velasquez had committed a series of robberies with Madrigal and planned to rob the Jack in the Box. In addition, defendant discussed the Jack in the Box robbery with Madrigal, agreed to participate, and was at the designated meeting place when Madrigal arrived a few hours before the robbery. Moreover, defendant got in the car with Madrigal and Velasquez when they left to rob the Jack in the Box.

Regardless, any error was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710]; *People v. Watson* (1956) 46 Cal.2d 818, 837.) There was additional evidence establishing defendant's participation in the Jack in the Box robbery, including (a) Madrigal's testimony identifying defendant as a participant, and (b) the criminalist's testimony confirming that defendant's DNA was on the red bandana from the getaway car. In addition, the trial court instructed the jury that it could not consider Velasquez's text as evidence of defendant's guilt unless it found by a preponderance of the evidence the elements of the coconspirator hearsay exception were met. We reject defendant's contentions.

(ECF No. 14-11 at 8-10.)

## C. Discussion of Confrontation Clause Argument

Petitioner contends admission of the text message violated his Confrontation Clause rights under the Aranda/Bruton rule. In Bruton v. United States, 391 U.S. 123 (1968), the Court held that the admission of a facially incriminating confession of a non-testifying co-defendant violates this right. People v. Aranda, 63 Cal.2d 518 (1965), is California's equivalent of Bruton.

////

13

1      However, the <u>Aranda/Bruton</u> rule applies only where the co-defendant's statement was

2  testimonial.  <u>Lucero</u>, 902 F.3d at 988 (every Circuit Court to consider the issue has held that, after

3  <u>Crawford</u>, the <u>Bruton</u> rule applies only to testimonial statements).  There is no question that a text

4  message from a co-defendant to a co-perpetrator is non-testimonial because it is a private

5  message that was certainly not intended as a formal statement to be used later at trial.  <u>See</u> <u>United</u>

6  <u>States v. Manfre</u>, 368 F.3d 832, 838 n.1 (8th Cir. 2004) ("[Declarant's] comments were made to

7  loved ones or acquaintances and are not the kind of memorialized, judicial-process-created

8  evidence of which *Crawford* speaks."); <u>Sissac v. Montgomery</u>, No. 16cv2287-BAS (JLB), 2018

9  WL 3375110, at *22 (S.D. Cal. Jul. 11, 2018) (finding that "text messages" between defendant

10  and his best friend were "not testimonial under *Crawford*").  Because Velasquez's text message to

11  Madrigal was not testimonial under <u>Crawford</u>, its admission did not violate petitioner's

12  Confrontation Clause rights.  Accordingly, the state court's rejection of petitioner's Confrontation

13  Clause claim was not contrary to, or an unreasonable application of, clearly established federal

14  law.

15        **D.  Discussion of Hearsay Argument**

16      Petitioner's challenge to the admission of the text message on the grounds that it was

17  hearsay, is a state law issue not cognizable in this federal habeas action.  <u>See</u> <u>Henry v. Kernan</u>,

18  197 F.3d 1021, 1031 (9th Cir. 1999) (a state's failure to comply with state rules of evidence is not

19  a basis for granting habeas relief on due process grounds); <u>Jammal v. Van de Kamp</u>, 926 F.2d

20  918, 919 (9th Cir. 1991).  And, even if the evidence was unreliable on that basis, petitioner fails

21  to show its admission rendered his trial fundamentally unfair.  <u>Jammal</u>, 926 F.2d at 919 (Errors of

22  state evidentiary law may violate due process only where "the evidence so fatally infected the

23  proceedings as to render them fundamentally unfair.").  As described by the state Court of

24  Appeal, Madrigal's testimony that petitioner was involved in the Jack-in-the-Box robbery was the

25  primary evidence of petitioner's involvement and was corroborated not only by the text message

26  but also by the evidence of petitioner's DNA found on the scarf in the getaway car.  The Court of

27  Appeal's decisions on petitioner's hearsay challenge to the text message were not contrary to, or

28  an unreasonable application of, clearly established federal law.

1    Petitioner's claim 1, challenging the admission of Velasquez's text message to Madrigal,

2    should fail.

3    **II. Instructional Error**

4    Petitioner next argues that a jury instruction was argumentative and violated his due

5    process rights.  While the prosecution did not charge petitioner with the crime of conspiracy, the

6    trial court instructed the jury pursuant to CALCRIM 416 that:  "The People have presented

7    evidence of a conspiracy as to the robbery of Jack in the Box charged in count 10."  (ECF No. 14-

8    6 at 227.)  The court then went on to provide the jury with the elements of a conspiracy.[3]  The

9    court also informed the jury that CALCRIM No. 416 was given in the context of instructing the

10   jury that it could consider Velasquez's text only if the prosecution had proven the required

11   elements for the co-conspirator hearsay exception.  (ECF No. 14-6 at 228.)

12   **A.  Legal Standards**

13   To obtain relief on federal habeas corpus review based on instructional error, a petitioner

14   must show that the error "'so infected the entire trial that the resulting conviction violates due

15   process.'"  Estelle, 502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)); see

16   also Middleton v. McNeil, 541 U.S. 433, 437 (2004); Hendricks v. Vasquez, 974 F.2d 1099, 1106

17   (9th Cir. 1992).  The standard for determining whether a petitioner is entitled to relief is whether

18   the error "had substantial and injurious effect or influence in determining the jury's verdict."

19   Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Fry v. Pliler, 551 U.S. 112, 121–22 (2007) (on

20   federal habeas review, the Brecht standard applies whether or not the state court has applied

21   harmless error analysis under Chapman v. California, 386 U.S. 18 (1967)).

22   **B.  Decision of the State Court**

23        The trial court gave the jury uncharged conspiracy instructions,
24        including CALCRIM No. 416, which included the following
         sentence: "The People have presented evidence of a conspiracy as to
25        the robbery of Jack in the Box charged in count 10." Where, as here,

26   [3] The jury was instructed that to prove a conspiracy, the prosecution must prove that (1) the
     defendant intended to agree and did agree with a co-defendant to commit robbery; (2) at the time
27   of the agreement, the defendant and co-defendant intended that one or more of them would
     commit robbery; and (3) the defendant or co-defendant committed the overt acts of bringing the
28   bandanas to accomplish the robbery.  (ECF No. 14-6 at 227-28.)

the prosecution did not charge conspiracy as an offense but introduced evidence of a conspiracy to introduce hearsay statements of coconspirators, a court has a "sua sponte duty" to give the CALCRIM No. 416 instruction. (Bench Notes to CALCRIM No. 416 (Apr. 2014) p. 178, citing *People v. Pike* (1962) 58 Cal.2d 70, 88 & *People v. Ditson* (1962) 57 Cal.2d 415, 447.)

Although, as defendant concedes in his brief, the instruction provided the elements necessary to prove conspiracy and the jury was instructed that guilt must be proved beyond a reasonable doubt, defendant contends it was error to give this instruction because it gave the prosecution an evidentiary advantage and was argumentative. The People contend defendant forfeited the issue by agreeing to the instruction at trial, but, given our determination on the merits, we need not reach this issue. (*See* § 1259 [this court "may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"]; *but see People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087 ["[g]enerally, a party may not complain on appeal about a given instruction that was correct in law and responsive to the evidence unless the party made an appropriate objection"].)

Instructional error is determined from the entire charge of the court, not by isolated parts of the instructions or from one particular instruction. (*People v. Smithey* (1999) 20 Cal.4th 936, 963-964.) Rather, a reviewing court reads the instructions as a whole to determine whether there is a reasonable likelihood they confused or misled the jury. (*See, e.g., People v. Hughes* (2002) 27 Cal.4th 287, 341.) We presume the jurors understood, correlated, and correctly applied the instructions. (*People v. Carey* (2007) 41 Cal.4th 109, 130.) An instruction is argumentative when it "recites facts drawn from the evidence in such a manner as to constitute argument to the jury in the guise of a statement of law," or " ' " 'invite[s] the jury to draw inferences favorable to one of the parties from specified items of evidence.' " ' " (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1244; *see People v. Lewis* (2001) 26 Cal.4th 334, 380-381.)

Despite defendant's contentions, the instruction here neither invites inferences that are favorable to either party nor integrates facts of the case as an argument to the jury. The language was neutral and properly outlined the requisite elements of a conspiracy. (*People v. Williams* (2008) 161 Cal.App.4th 705, 710.) The instruction also properly explained, "You [(the jury)] must decide as to each defendant whether he or she was a member of the alleged conspiracy," making clear it was for the jury to decide whether the prosecution proved the elements of a conspiracy. (*Ibid.*) In addition, defendant was charged with robbery, not conspiracy, and CALCRIM No. 416 was given in the context of instructing the jury that it could consider Velasquez's text only if the prosecution had proven the required elements for the coconspirator hearsay exception. Moreover, the trial court properly instructed the jury with CALCRIM No. 220 that the prosecution was required to prove defendant "guilty beyond a reasonable doubt." Considered as a whole, the instructions indicated the jury was to determine defendant's guilt and could

16

consider Velasquez's text only if it determined the prosecution had proven the elements of the coconspirator hearsay exception. (*Williams*, at pp. 710-711.)

Regardless, any error was harmless beyond a reasonable doubt. (*Chapman v. California*, *supra*, 386 U.S. at p. 24; *see People v. Hunter* (2011) 202 Cal.App.4th 261, 278.) The instruction was given in the context of whether the jury could consider Velasquez's text, and, as previously discussed, there was ample other evidence of defendant's guilt, including accomplice testimony and DNA evidence.

(ECF No. 14-11 at 10-12.)

### C.  Discussion of Instructional Error Claim

Petitioner argues that the instruction was argumentative in violation of his due process rights because it told the jurors that the prosecutor had established a conspiracy.  Petitioner points out that the prosecutor relied on a conspiracy theory to establish appellant's complicity with the Jack-in-the-Box robbery.  Because the instruction started by informing the jury that the prosecution had "presented evidence of a conspiracy," petitioner argues that the instruction lightened the prosecution's burden of proving a conspiracy beyond a reasonable doubt.

To the extent petitioner challenges the correctness of the uncharged conspiracy instruction as a matter of state law, his claim does not merit federal habeas relief.  See Estelle, 502 U.S. at 71-72 (allegation that jury instruction was incorrect under state law "not a basis for habeas relief").  Petitioner's due process argument can only succeed if he shows the error "'so infected the entire trial that the resulting conviction violates due process.'"  Id. at 72.  He has not done so.

There was ample evidence of a conspiracy at trial.  The text message from Velasquez to Madrigal showed their planning and Madrigal further testified that he discussed the robbery beforehand with petitioner and petitioner agreed to participate.  Further, as the Court of Appeal pointed out, the purpose of the instruction was to demonstrate an exception to the hearsay rule to permit the jury to consider Velasquez's text message to Madrigal.  Even if petitioner could show the instruction was erroneous, its attenuated purpose, along with the significant evidence of petitioner's involvement in the crime, render any argument that the instruction infected the trial with unfairness baseless.  Moreover, to the extent the jury could have relied on the instruction in determining petitioner's guilt of robbery, the trial court's instruction that the jury must find all

17

elements beyond a reasonable doubt relieved any chance that CALCRIM 416 lightened the prosecution's burden.

Petitioner fails to show the Court of Appeal's rejection of his challenge to CALCRIM 416 was contrary to, or an unreasonable application of, clearly established federal law.  Claim 2 should be denied.

## III.  Sufficiency of Evidence to Prove Gang Enhancement

Petitioner argues that there was insufficient evidence to prove an element necessary for the gang enhancement –an associational or organizational connection that unites members of a putative criminal street gang.  Petitioner further argues that the evidence was insufficient to show that he was associated with the gang or gangs that committed the two predicate offenses shown at trial.

### A.  Applicable Legal Principles

#### 1.  Standards for Sufficiency of the Evidence Claim

The United States Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326.  State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law."  Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 324 n.16).

The Supreme Court recognized that Jackson "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."  Cavazos v. Smith, 565 U.S. 1, 2

18

1   (2011) (per curiam).  Moreover, "a federal court may not overturn a state court decision rejecting

2   a sufficiency of the evidence challenge simply because the federal court disagrees with the state

3   court.  The federal court instead may do so only if the state court decision was 'objectively

4   unreasonable.'"  Id. (citing Renico v. Lett, 559 U.S. 766 (2010)).  The Supreme Court cautioned

5   that "[b]ecause rational people can sometimes disagree, the inevitable consequence of this settled

6   law is that judges will sometimes encounter convictions that they believe to be mistaken, but that

7   they must nonetheless uphold."  Id.

8               **2.  State Law Standards**

9         Pursuant to California Penal Code § 186.22(b), a sentence enhancement may be imposed

10  when a felony was "committed for the benefit of, at the direction of, or in association with any

11  criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct

12  by gang members."  "Criminal street gang" is defined in § 186.22(f):

13                  As used in this chapter, "criminal street gang" means any ongoing
                    organization, association, or group of three or more persons, whether
14                  formal or informal, having as one of its primary activities the
                    commission of one or more of the criminal acts enumerated in
15                  paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of
                    subdivision (e), having a common name or common identifying sign
16                  or symbol, and whose members individually or collectively engage
                    in, or have engaged in, a pattern of criminal gang activity.
17

18  The referenced enumerated paragraphs include the crime of robbery.  Cal. Penal Code §

19  186.22(e)(2).

20        To establish a "pattern of criminal gang activity" the prosecution must prove:

21                  the commission of one or more of the offenses enumerated in
                    paragraphs (26) to (30), inclusive, of subdivision (e), and the
22                  commission of one or more of the offenses enumerated in paragraphs
                    (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e). A
23                  pattern of gang activity cannot be established solely by proof of
                    commission of offenses enumerated in paragraphs (26) to (30),
24                  inclusive, of subdivision (e), alone.

25  Cal. Penal Code § 186.22(j).

26        In People v. Prunty, 62 Cal. 4th 59 (2015), the California Supreme Court held that gang

27  subsets meet the subsection (f) definition where the prosecution shows "some associational or

28  organizational connection uniting those subsets."  The connection may be shown with evidence of

1    collaboration or organization, the sharing of material information, the participation in a larger

2    group, or self-identification by subset members with a larger group.  Prunty, 62 Cal. 4th at 71.

3    **B.  Decision of the State Court**

4        According to defendant, the evidence was insufficient to support the

5    gang enhancement because the People failed to establish the required element of a "criminal street gang." (§ 186.22, subd. (b)(1).) Relying

6    on *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), defendant contends the predicate offenses described by the People's gang

7    expert were committed by members of unnamed Sureño subsets and there was no substantial evidence linking this generic or greater

8    Sureño gang to defendant's subset. We disagree.

9        On appeal of a section 186.22 gang enhancement, " ' " we review the whole record in the light most favorable to the judgment to determine

10   whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable

11   trier of fact could find the defendant guilty beyond a reasonable doubt.

12   [Citations.]" ' [Citation.] ' . . . Thus, we presume every fact in support

13   of the judgment the trier of fact could have reasonably deduced from the evidence.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 806; see

14   *People v. Ortiz* (1997) 57 Cal.App.4th 480, 484 [substantial evidence standard of review applies to § 186.22 gang enhancements].)

15       Section 186.22, subdivision (b)(1) increases punishment for those

16   who commit felonies "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to

17   promote, further, or assist in any criminal conduct by gang members . . . ."

18       A group is a " 'criminal street gang' " (§ 186.22, subd. (f)) if: "(1)

19   the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's

20   primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must

21   engage in, or have engaged in, a pattern of criminal gang activity. [Citations.] [¶] A ' "pattern of criminal gang activity" ' is defined as

22   gang members' individual or collective 'commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained

23   juvenile petition for, or conviction of two or more' enumerated 'predicate offenses' during a statutorily defined time period.

24   [Citations.] The predicate offenses must have been committed on separate occasions, or by two or more persons." (*People v. Duran*

25   (2002) 97 Cal.App.4th 1448, 1457.)

26       In *Prunty*, the court held that "where the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section

27   186.22[, subdivision] (f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some

28   associational or organizational connection uniting those subsets." (*Prunty, supra*, 62 Cal.4th at p. 71.) There are multiple ways to show

such a connection, such as "evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together. And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization." (Ibid.) Ultimately, the People must show the defendant sought to benefit the "same 'group' that meets the definition of section 186.22[, subdivision] (f)—i.e., that the group committed the predicate offenses and engaged in criminal primary activities . . . ." (*Prunty*, at p. 72.)

We conclude the evidence presented at trial sufficiently established the existence of a criminal street gang under *Prunty* because the prosecution offered evidence of an organizational connection between the Sureño umbrella group and its Sacramento subsets. The gang expert testified the Mexican Mafia asserts authority over all the Sureños, including setting rules such as banning drive-by shootings and requiring payment of "taxes" to the Mexican Mafia, in exchange for protection of incarcerated Sureños. In addition, the prosecution established an organizational connection among the Sacramento Sureño subsets. The gang expert testified that members of different Sureño subsets are commonly seen together in the same vicinity and territory, "getting along." "As long as [a gang member is] in good standing with the [Sureño] gang, they're welcome at any of their gang hangouts." Significantly, the Sacramento Sureño subsets "sit at the same table" and work together, including holding monthly meetings to "talk business." Madrigal also testified that the Angelino Heights and Howe Park Sureños have a historical alliance and share guns among themselves and with the Santa Anita Park Sureñas.

That the Sureño subsets were working together and had an organizational connection is further indicated by the testimony of defendant's accomplice, Madrigal, who explained Velasquez and members of two other Sureño subsets met and planned the crimes at issue here "to benefit the gang" and "get money so we could get drugs and guns." Even if the criminal proceeds went to inmate Zamora, according to Detective Guzman, the gang would still benefit because committing the crimes would enhance the gang's status within the community, help the gang become more proficient at committing crimes, and bring the gang into the good graces of the Mexican Mafia.

Accordingly, there was substantial evidence upon which the jury could reasonably conclude the larger Sureño gang qualified as a criminal street gang, and that defendant committed the crimes at issue here for the benefit of the larger Sureño gang with the intent to further the gang's activities. We find no error.

(ECF No. 14-11 at 12-15.)

////

21

**C.  Analysis of Sufficiency of the Evidence Claim**

Petitioner argues there was insufficient evidence to prove an associational or organizational connection that unites members of a putative criminal street gang.  Petitioner further argues that the evidence was insufficient to show that he was associated with the gang or gangs that committed the two predicate offenses introduced at trial.

**1.  Connection Between Gangs**

In <u>Prunty</u>, the California Supreme Court held that gang subsets meet the subsection (f) definition where the prosecution shows "some associational or organizational connection uniting those subsets."  The connection may be shown with evidence of collaboration, the sharing of material information, the participation in a larger group, or self-identification by subset members with a larger group.  <u>Prunty</u>, 62 Cal. 4th at 71.

Detective Guzman testified there are two primary Hispanic gangs in Sacramento County: the Norteños and Sureños.  (ECF No. 14-5 at 261.)  Norteños on the outside are associated with the prison gang Nuestra Familia, and Sureños on the outside are associated with the Mexican Mafia prison gang.  (ECF No. 14-5 at 261, 269.)  The Sureños originated in Southern California but can be found in Sacramento.   (ECF No. 14-5 at 263.)  Under the Sureño umbrella are a number of subsets in the Sacramento area, including "SHG," a North Highlands subset, "VST" or Varrio Sur Trese, and "Caya 47th" in South Sacramento.  (ECF No. 14-5 at 263.)  The Howe Park Sureños is also a subset, and within that subset is the Santa Anitas Park Sureños ("SPS"), a sub-subset of female gang members.  (ECF No. 14-5 at 266, 277; <u>see also</u> ECF No. 14-6 at 45.)  Additionally, in Sacramento there is a subset originating from Southern California called the "Angelinos Heights Sureños."  Because there is no Angelinos Heights neighborhood in Sacramento, a member of the small subset travels once a month to Southern California to attend monthly gang meetings and to pay taxes.  (ECF No. 14-5 at 276-77.)  Guzman further testified that it was not uncommon for law enforcement to encounter North Sacramento gang members in the company of South Sacramento gang members, or to see Sureños from several different neighborhoods or cliques "all together getting along."  (ECF No. 14-5 at 263-64.)

////

Guzman testified that while the Howe Park Sureños were the largest of the Sureño subsets, "they all hold their own weight" and "sit at the same table" and "all attend a monthly meeting." (ECF No. 14-6 at 46-47, 56-57.)  The meetings typically occur on the 13th of the month in different locations, where the subsets all get together to meet and talk business. (ECF No. 14-6 at 46-47.)

The Mexican Mafia prison gang requires the payment of taxes from Sureño street gangs and their subsets to ensure protection for any Sureño gang member sentenced to serve time in prison and has decried drive-by shootings by its members following an incident in Southern California resulting in the death of a child bystander. (See ECF No. 14-5 at 269-70.) The primary criminal activities committed by Sureño gang members are murder, possession of firearms, robbery, assault with a deadly weapon, possession of controlled substances for sale, burglary, carjacking, and home invasion robbery. (ECF No. 14-5 at 274-75.)

Detective Guzman testified about the relationship between the Howe Street and Angelino Heights Sureño gang members: "they all get along together," and that it is "not uncommon to see Sureño gang members from different neighborhoods or cliques as they like to stay together, hanging out together, working together." (ECF No. 14-5 at 289.)  Because the Angelino Heights subset does not have or claim its own geographical area in Sacramento, it is "not uncommon to see [Angelino Heights members] hanging out" in other subset neighborhoods such as Howe Park territory near Howe Park and Bell Avenue, or to see Caya47th gang members in Howe Park territory or Howe Park gang members at Chateau Lang which is a Caya47th hangout. (ECF No. 14-5 at 289-90.)

Guzman believed petitioner to be a Sureño gang member, and member of the Angelino Heights subgroup, for a number of reasons:  (1) petitioner had previously been validated as an Angelino Heights Sureño gang member; (2) petitioner committed the crime with two other Sureño gang subset members - Madrigal, an Angelino Heights member, and Velasquez, a Santa Anita Park Sureña; (3) petitioner had three tattoos showing his gang affiliation – a symbol for the Mexican Mafia, the words "Angelino Heights," and the letters "AH;" (4) petitioner used a Sureño gang hand sign in his booking photo; and (5) petitioner had a "long history of contacts with law

23

enforcement involving other identified and prior validated gang members," including contacts with Howe Park members and other Angelino Heights members.  (ECF No. 14-5 at 283-89; ECF No. 14-6 at 47.)

In Guzman's opinion, robbery, and the proceeds of those crimes, benefit the Sureño gang because that crime facilitates the commission of other criminal activities.  (ECF No. 14-6 at 33.) Even where the proceeds of those crimes are being funneled to a Sureño inmate serving time in state prison, where that individual seemed to direct or assist in those crimes, there remains a benefit to the gang.  (ECF No. 14-6 at 33-34.)  The money sent to the Sureño gang member inmate serving time in state prison benefits the Mexican Mafia prison gang and "elevates that Sureño gang subset in the eyes of that stronger dominant prison gang."  (ECF No. 14-6 at 36.) And, when that inmate is ultimately released back to the streets as a Sureño gang member, the individuals who assisted him will be in that "O.G."'s good graces.[4]  (ECF No. 14-6 at 37.)  The "soldiers" in the gang who carry out the robberies and carjackings in association with Sureño street gangs will gain respect and see their status increased, thereby increasing the reputation of the gang as a whole.  (ECF No. 14-6 at 37-38.)

Further, the testimony of Pedro Madrigal, an Angelino Heights Sureño, directly involved in a number of the string of carjacking and robbery crimes, including the robbery at issue in this case, supports the state court's determination that the evidence was sufficient to support the gang enhancements here.  (See, e.g., ECF No. 14-4 at 199-212 [Sacramento subsets hung out and worked together], 218 [Angelino Heights and Howe Park members "all associate together"], 219-22 [the series of crimes were planned together at the home of a Howe Park member; the purpose of the robberies was to purchase guns and drugs for the gang], 225-27 [told to go by Velasquez], 228, 274-75 [Velasquez provided beanies and bandanas worn by petitioner and Madrigal during the robbery], 234 ["Mudo" (Howe Park gang member) provided the guns], 277 [latex gloves used came from Velasquez's car]; see ECF No. 14-5 at 8 [gun used in robbery came from Mudo], 13-14 [common to share guns among Angelino Heights, Howe Park, and Santa Anita Park gangs],

---

[4] Guzman defined an OG as "an original -- you know, an older, more sophisticated gang member who's not just talked the talk but walked the walk to the point where he's gone to prison or jail."

1   54-55 [Angelino Heights and Howe Park get along and work together], 64-66 [doesn't know

2   who's in charge of Howe Park but Mudo is "up there"], 66-67 [doesn't know if Howe Park took

3   orders from a female but "they all agreed on doing something together"], 78 [if an Angelino

4   Heights member was not at a meeting, all were told what happened at the meeting so they would

5   be "on the same basis"], 80 [meeting at Sacramento River attended by Howe Park and Angelino

6   Heights members and Velasquez, as a Santa Anita Park member].)

7          The record reveals sufficient evidence of collaboration and association between the

8   various Sureño subsets in Sacramento, evidence that they committed crimes for the benefit of the

9   Sureño gang, including evidence of petitioner's involvement in the robbery along with other

10  Sureño members.  This case is unlike Prunty, as the Third District Court of Appeal held, because

11  there was evidence showing collaboration among Sureño subset members that permitted the jury

12  to reasonably infer that the Sureño gang petitioner sought to benefit is one and the same with the

13  Sureño gang established by the prosecution.  A rational trier of fact could have found the essential

14  elements of Penal Code §186.22 present here.  Jackson, 443 U.S. at 319.  This court finds no

15  basis to upset the "near-total deference" to which the jury's findings are entitled.  Bruce v.

16  Terhune, 376 F.3d 950, 957 (9th Cir. 2004).

17         Given the foregoing, it was not an unreasonable application of the Jackson standard for

18  the state appellate court to conclude that there was sufficient evidence to permit the jurors to draw

19  the reasonable inference that the Sacramento Sureño gang's members engaged in a pattern of

20  criminal activity, nor did the state appellate court base its finding on an unreasonable

21  determination of the facts.  Therefore, it cannot be said that the Third District Court of Appeal's

22  rejection of petitioner's challenge to the sufficiency of the evidence was "objectively

23  unreasonable" or "so lacking in justification that there was an error well understood and

24  comprehended in existing law beyond any possibility for fair-minded disagreement."  See

25  Coleman, 566 U.S. at 651; Richter, 562 U.S. at 103; Juan H. v. Allen, 408 F.3d 1262, 1275 n.13

26  (9th Cir. 2005).

27  ////

28  ////

1

**2. Relationship to Gang Involved in Predicate Offenses**

2          Petitioner cites <u>Prunty</u> for the proposition that evidence of the conduct of a member of a

3   subset does not satisfy the predicate offenses requirement "without demonstrating that these

4   subsets are somehow connected to each or another larger group."  He contends there was

5   insufficient evidence to prove a relationship between the Angelino Heights gang with the gang

6   affiliations of the perpetrators of the two predicate offenses.

> A "pattern of criminal gang activity" is defined as gang members'
> individual or collective "commission of, attempted commission of,
> conspiracy to commit, or solicitation of, sustained juvenile petition
> for, or conviction of two or more" enumerated "predicate offenses"
> during a statutorily defined time period. (§ 186.22, subd. (e).)  The
> predicate offenses must have been committed on separate occasions,
> or by two or more persons. (§ 186.22, subd. (e).)  The charged crime
> may serve as a predicate offense, as can "evidence of the offense with
> which the defendant is charged and proof of another offense
> committed on the same occasion by a fellow gang member."

13   <u>People v. Duran</u>, 97 Cal. App. 4th 1448, 1457 (2002) (some internal citations omitted).

14          Guzman testified to two predicate offenses.  The first offense was committed by validated

15   Sureño gang member Mario Rodriguez in 2012.  After a search of Rodriguez's residence at 6100

16   Dove Court uncovered firearms, Rodriguez was convicted in 2013 of being a felon in possession

17   of a firearm and being a felon in possession of ammunition in violation of California Penal Code

18   § 186.22(e)(31) and § 29800(a)(1).  Rodriguez admitted to police he had the gun for his

19   protection against rival Norteño gang members.  (ECF No. 14-5 at 278-82.)

20          The second offense was committed by validated Sureña gang member Daisy Ramirez in

21   2011.  She was convicted in 2013 of assault with a firearm and discharging a firearm from a

22   moving vehicle at a group of five Norteño gang members in violation of Penal Code §

23   186.22(e)(1) and § 186.22(e)(6).  The crime occurred in the North Highlands area of Sacramento.

24   (ECF No. 14-5 at 279-80.)

25          The Court of Appeal noted, and as this court described above, that the prosecution offered

26   evidence of an organizational connection between the Sureño umbrella group and its Sacramento

27   subsets.  Petitioner provides no reason to think that this evidence was insufficient for the jury to

28   find that the predicate offenses were committed by members of the umbrella Sureño gang, just as

1  petitioner was a member of that umbrella group by virtue of his membership in the Angelino

2  Heights subgroup.  Nor does petitioner cite California law requiring that the prosecution must

3  prove which subsets, if any, the perpetrators of the predicate offenses belonged to.  While the

4  predicate offenses in this case could or may have involved gang members of another subset of the

5  Sureños gang overall, petitioner does not contend that the areas referenced involved some other

6  geographical location than the Sacramento area and evidence established association between

7  Sacramento subsets.

8       The state court held that there was sufficient evidence for the jury to conclude the

9  predicate offenses were committed by members of a gang affiliated with petitioner's gang.  This

10  conclusion was not an unreasonable application of the Jackson requirement that the evidence be

11  such that any rational trier of fact could find the essential elements of the crime beyond a

12  reasonable doubt.

13       Neither of petitioner's arguments meet the standard of 28 U.S.C. § 2254(d) by

14  establishing the state court's decision was contrary to, or an unreasonable application of, clearly

15  established federal law or was based on an unreasonable determination of the facts.  Therefore,

16  this court recommends petitioner's third claim regarding the gang enhancement be denied.

**CONCLUSION**

18       For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's petition

19  for a writ of habeas corpus be denied.

20       These findings and recommendations will be submitted to the United States District Judge

21  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within thirty days after

22  being served with these findings and recommendations, any party may file written objections with

23  the court and serve a copy on all parties. The document should be captioned "Objections to

24  Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be

25  filed and served within seven days after service of the objections.  The parties are advised that

26  failure to file objections within the specified time may result in waiver of the right to appeal the

27  district court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In the objections, the

28  party may address whether a certificate of appealability should issue in the event an appeal of the

27

1  judgment in this case is filed.  <u>See</u> Rule 11, Rules Governing § 2254 Cases (the district court must

2  issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

3  Dated:  April 12, 2021

4

5

6                                                        DEBORAH BARNES
                                                         UNITED STATES MAGISTRATE JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19  DLB:9
    DB/prisoner-habeas/pere0629.fr
20

21

22

23

24

25

26

27

28